ORIGINAL

AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ALBERTO MOLINA | DOCKET NO.<br>19MJ03384 |
|---|---|
| | MAGISTRATE'S CASE NO.<br>FILED<br>CLERK, U.S. DISTRICT COURT<br>AUG 16 2019<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY |

Complaint for violation of Title 21, United States Code, Section 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE JOHN E. MCDERMOTT | UNITED STATES<br>MAGISTRATE JUDGE | Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>August 15, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [21 U.S.C. § 841(a)(1)]

On or about August 15, 2019, in Los Angeles County, within the Central District of California, defendants ALBERTO MOLINA knowingly possessed with intent to distribute a controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**ANTHONY BLISS** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>John E. McDermott | DATE<br>8/16/19 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Matthew J. Jacobs 213-894-2213     REC: Detention

## AFFIDAVIT

I, Anthony Bliss, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Alberto Molina ("ALBERTO") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search three digital devices in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the DEA in the Los Angeles Field Division located in Los Angeles, California.  I have been so employed since April 2015.  I have attended the DEA Training Academy in Quantico, Virginia, where I received specialized training in investigating violations of the Controlled Substances Act.  I have also been involved in numerous DEA investigations into drug trafficking, many of which have arisen out of the work in the Los Angeles Field Division. Prior to my employment with the DEA, I served as a U.S. Border Patrol Agent for approximately eight years.  During my career there, I was involved in numerous drug-related arrests.  I also interviewed numerous witnesses and suspects regarding drug-related activities.

6.    Based on my training and experience, I am familiar with the methods of operation of drug traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as the collection of money proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.  I am also familiar with and have used a wide variety of investigative techniques, including the development of cooperating sources, source debriefings, witness interviews, suspect interviews,

physical surveillance, telephone toll analysis, and wire
surveillance.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On August 7, 2019, Ricardo Molina-Carranza ("MOLINA")
sold approximately two pounds of methamphetamine to a
confidential informant (the "CI").  MOLINA delivered the drugs
to the CI in a white Toyota Sedan registered to ALBERTO
("ALBERTO's Vehicle").  The Honorable John E. McDermott, United
States Magistrate Judge authorized a complaint alleging that
MOLINA had possessed a controlled substance with intent to
distribute in violation of 21 U.S.C. § 841.

8.    MOLINA then agreed to sell the CI methamphetamine and
fentanyl pills.  On August 15, 2019, MOLINA drove a blue truck
("MOLINA's Vehicle") to meet the CI and said that another person
would deliver the drugs.  ALBERTO later arrived to meet the CI
in ALBERTO's Vehicle with approximately seven pounds of
methamphetamine and approximately three pounds fentanyl pills.
Law enforcement arrested MOLINA and ALBERTO and found the
SUBJECT DEVICES in MOLINA's Vehicle.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.    The CI Talks to a Mexican Drug Trafficking Broker**

10.   In July 2019, the CI told DEA agents that the CI knew a drug trafficking organization willing to sell the CI drugs.[1] According to the CI, the CI spoke to a drug broker (the "broker") for the drug trafficking organization, which was in Mexico.  The broker provided the CI a phone number, 714-586-2600.  On July 20, 2019, the CI called that number and the man at that number said he could sell the CI two pounds of methamphetamine.  The calls are recorded and in the Spanish language.  An agent who is fluent in the English and Spanish language translated the calls to me in the English language.

**B.    The CI Contacts MOLINA**

11.   According to the CI, the broker gave the CI another phone number, 619-672-6270 ("MOLINA's Number"), to purchase two pounds of methamphetamine.  On August 6, 2019, the CI called MOLINA'S Number and spoke with an individual later identified as MOLINA.  MOLINA said he would sell the CI two pounds of methamphetamine for $4,000.  The CI and MOLINA agreed to meet in the San Pedro, California area on August 7, 2019 to conduct the drug transaction.  The CI agreed to text MOLINA once the CI was at a meeting location.  The calls are recorded and in the Spanish language.  An agent who is fluent in the English and Spanish language translated the calls to me in the English language.

---

[1] To the best of my knowledge, the CI has been working with the DEA since 2006 in exchange for financial compensation. The CI has a criminal history involving drug possession.

### C.   MOLINA Sells Two Pounds of Methamphetamine to the CI on August 7, 2019 in ALBERTO's Car

12.   On August 7, 2019, the CI drove to the parking lot of a Target store in San Pedro to conduct a drug transaction with MOLINA.  Prior to the meeting, law enforcement officers searched the CI and the CI's car and did not find any drugs.  Law enforcement officers provided the CI with $4,000 and placed an audio and video recording device on the CI.

13.   According to the law enforcement conducting surveillance, at approximately 4:00 P.M., the CI arrived at the parking lot of the Target.  The CI texted his/her location to MOLINA at MOLINA's Number.  At approximately 4:40 P.M., surveillance units saw MOLINA arrive at the Target parking lot driving a white Toyota sedan, bearing California license plate 8AAH041, ALBERTO's Vehicle.  MOLINA was the sole occupant of ALBERTO's Vehicle.

14.   Based on a search of California Department of Motor Vehicles' ("DMV") records, a law enforcement officer learned and told me that ALBERTO's Vehicle is registered to an ALBERTO at 14022 Coteau Drive, Apt. 904, Whittier, CA.  Based on my review of MOLINA's California driver's license, I learned that MOLINA reported the same address as his residence to the DMV.

15.   The surveillance team saw the CI enter the front passenger side of ALBERTO's Vehicle.  According to the CI, once inside ALBERTO's Vehicle, the CI recognized MOLINA's voice as the person who arranged to sell two pounds of methamphetamine for $4,000 on MOLINA's Number.  Inside ALBERTO's Vehicle, MOLINA

5

gave the CI a white plastic bag containing two clear vacuum-sealed bags of a white substance.  The CI believed the white substance to be the two pounds of methamphetamine.  The CI then gave MOLINA $4,000.  According to the CI, the white plastic bag was on the front-passenger-seat floor of ALBERTO's Vehicle.

16.  At approximately 4:48 P.M., law enforcement conducting surveillance saw the CI get out of ALBERTO's Vehicle and walk towards his/her vehicle.  While the CI drove away from the Target parking lot, DEA SAs Matthew Lozowski, Jordan Lester, and I followed the CI to a separate location.  Once we arrived at the separate location, DEA SA Lozowski and I took custody of the white plastic bag MOLINA gave the CI and found two clear vacuum-sealed bags.  Because the vacuum-sealed bags were clear, I saw white crystalline substance inside the two vacuum-sealed bags. Because exposure to certain controlled substances can be dangerous even in very small amounts, I did not field-test the contents of the bags.  However, based on my training and experience, my knowledge of the investigation, and on the appearance of the contents of those two bags, I believe the white crystalline substance is the methamphetamine that MOLINA agreed to sell and sold to the CI.

17.  Later that day, I placed the two vacuum-sealed bags on a scale and saw that the bags and its contents weighed approximately 981.1 grams, which is approximately two pounds. The next day, I sent the vacuum-sealed bags to the DEA Southwest Laboratory for analysis.  Laboratory results are pending.

18.  On August 7, 2019, law enforcement officers maintained aerial and land surveillance on the ALBERTO's Vehicle as it drove away from the Target parking lot.  At approximately 4:55 P.M., at the request of DEA, a Los Angeles Police Department ("LAPD") patrol unit saw that ALBERTO's Vehicle did not have a front license plate and stopped ALBERTO's Vehicle.  The driver of the vehicle presented the LAPD officers with a California Driver's License that identified him as MOLINA.

19.  I reviewed MOLINA's California Driver's License photograph and I reviewed the audio-video recording of the August 7, 2019 drug transaction.  The audio-video recording depicts MOLINA as the individual who sold the CI the methamphetamine for $4,000.

20.  On August 14, 2019, the Honorable John E. McDermott, United States Magistrate Judge, authorized a complaint charging MOLINA with a violation of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and search warrants for ALBERTO's Vehicle, MOLINA's person, and the residence located at 14022 Coteau Drive, Apt. 904, Whittier, CA. On August 15, 2019, law enforcement officers executed the search warrants.  Law enforcement seized two cellular telephones from ALBERTO's Vehicle.  Law enforcement did not seize anything from the residence located at 14022 Coteau Drive, Apt. 904, Whittier, CA.

### D. MOLINA Plans to Sell Additional Methamphetamine and Fentanyl Pills to the CI

21. From August 7, 2019 to August 14, 2019, the CI and MOLINA negotiated another drug transaction over MOLINA's Number. MOLINA agreed to sell 20 pounds of methamphetamine and 5,000 fentanyl pills to the CI. According to the CI, MOLINA priced one pound of methamphetamine at $1,700 and one fentanyl pill at $10. MOLINA agreed to sell the 20 pounds of methamphetamine and 5,000 fentanyl pills to the CI on August 15, 2019 in the San Pedro area. The CI would contact MOLINA once the CI chose the location.

22. On August 14, 2019, the CI called MOLINA to confirm that the drug transaction would go forward on August 15, 2019 in the early afternoon. MOLINA confirmed. The CI agreed to contact MOLINA on August 15, 2019, once the CI chose a location in San Pedro.

### E. MOLINA and ALBERTO Sells Methamphetamine and Fentanyl Pills to the CI on August 15, 2019

23. On August 15, 2019, the CI drove to the parking lot of the San Pedro Fish Market and Restaurant (the "Fish Market") in San Pedro to conduct the second drug transaction with MOLINA. Prior to the meeting, law enforcement officers searched the CI and the CI's car and did not find any drugs. Law enforcement officers placed an audio and video recording device on the CI.

24. According to the law enforcement conducting surveillance, at approximately 12:45 P.M., the CI arrived at the parking lot of the Fish Market. The CI texted his/her location to MOLINA. At approximately 1:14 P.M., surveillance units saw

MOLINA arrive at the Fish Market parking lot driving MOLINA's
Vehicle.  MOLINA was the only person in MOLINA's Vehicle.  Based
on a search of DMV records, I learned that MOLINA's Vehicle is
registered to Estanisiada Carranza de Motina at 10750 Inez
Street, Whittier California.

25.   The surveillance team saw the CI enter the back
passenger side of MOLINA's Vehicle.  According to the CI, once
inside MOLINA's Vehicle, MOLINA said the drugs would be coming
from another person.

26.  At approximately 1:42 P.M., law enforcement conducting
surveillance saw ALBERTO arrive at the Fish Market parking lot
driving ALBERTO's Vehicle.  ALBERTO parked near MOLINA's
Vehicle, got out of his vehicle, and walked towards the driver's
side window of MOLINA's Vehicle.  The surveillance team saw
ALBERTO and MOLINA talking through the window and saw ALBERTO
leave the Fish Market parking lot in ALBERTO's Vehicle.

27.  Law enforcement officers maintained surveillance on
ALBERTO's Vehicle and saw ALBERTO's Vehicle drive to various
locations, but lost sight of ALBERTO's Vehicle at approximately
3:45 P.M.  Eventually, at approximately 4:26 P.M., ALBERTO came
back to the Fish Market parking lot driving ALBERTO's Vehicle.
ALBERTO was the sole occupant.

28.  According to the CI, when ALBERTO arrived, MOLINA told
the CI to go to ALBERTO's Vehicle to get the drugs.  The
surveillance team conducting surveillance saw the CI get out of
MOLINA's Vehicle and walk to the front passenger window of
ALBERTO's Vehicle.  According to the CI, the CI saw a brown bag

on the front-passenger-seat floor of ALBERTO's Vehicle.  Inside
the brown bag, the CI saw several clear bags that contained
white crystalline substance and blue pills.  According to the
CI, ALBERTO opened the center console and took out another clear
bag containing blue pills.  The CI believed the pills to be
fentanyl and the white crystalline substance to be
methamphetamine.  The CI took the bags, went back inside
MOLINA's Vehicle, and placed the bags in the bed of MOLINA's
Vehicle.

29.  After the CI placed the bags in MOLINA's Vehicle, law
enforcement officers drove towards them to initiate an arrest.
ALBERTO remained at the Fish Market parking lot.  MOLINA drove
away in MOLINA's Vehicle.

30.  Law enforcement officers stopped MOLINA's Vehicle at
Harbor Boulevard and Miner Street, near the Fish Market, and
arrested MOLINA.  Law enforcement officers found the packages of
white crystalline substance and blue pills in the bed of
MOLINA's Vehicle.

31.  Based on my review of the seized packages from
MOLINA's Vehicle, I saw seven clear bags containing white
crystalline substance and two clear bags containing blue pills.
Because exposure to certain controlled substances can be
dangerous even in very small amounts, I did not field-test the
contents of the box.  However, based on my training and
experience, my knowledge of the investigation, and on the
appearance of the contents of the clear bags, I believe the
white crystalline substance is the methamphetamine and the blue

pills are the fentanyl pills that MOLINA agreed to sell to the CI and that ALBERTO delivered to the CI.

32.   Later that day, I placed the white crystalline substance on a scale and saw that the bags and its contents weighed approximately 7.2 pounds.  I placed the blue pills on a scale and saw that the bags and its contents weighed approximately three pounds.  The suspected methamphetamine and fentanyl are in the process of being sent to the DEA Southwest Laboratory for analysis.  Laboratory results are pending.

33.   Law enforcement officers recovered two cellular phones inside ALBERTO's Vehicle and the SUBJECT DEVICES near the center console area inside MOLINA's Vehicle.

34.   Based on a search of DMV records, I saw ALBERTO's California Driver's License photograph and it matched ALBERTO.

### V.   <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

35.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

36. As used herein, the term "digital device" includes the SUBJECT DEVICES.

37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   38.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

       a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

     39.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

     a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.   The person who is in possession of a device or has the device among his belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALBERTO and MOLINA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ALBERTO and MOLINA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

40.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  <u>CONCLUSION</u>

41.  For all of the reasons described above, there is probable cause to believe that ALBERTO MOLINA has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____

Anthony Bliss, Special Agent
Drug Enforcement
Administration

Subscribed to and sworn before me this 16th day of AUGUST, 2019.

_____

HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

17

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on August 15, 2019 and currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

1.   a silver Apple iPhone X;

2.   an LG Model LG-H345 assigned international mobile equipment identification 354054-07-127902; and

3.   a black TCL cellular phone bearing model number TLP024C1.

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as

ii

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any SUBJECT DEVICE capable of being used to facilitate
the above-listed violations or containing data falling within
the scope of the items to be seized.

b.    The search team will, in its discretion, either
search each SUBJECT DEVICE where it is currently located or
transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

c.    The search team shall complete the search of the
SUBJECT DEVICE(S) as soon as is practicable but not to exceed
120 days from the date of issuance of the warrant.  The
government will not search the digital device(s) beyond this
120-day period without obtaining an extension of time order from
the Court.

d.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each SUBJECT DEVICE capable of containing any of
the items to be seized to the search protocols to determine
whether the SUBJECT DEVICE and any data thereon falls within the
scope of the items to be seized.  The search team may also

iv

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

    ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

    e.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

    f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

    g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

      h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      j.   After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    4.   During the execution of this search warrant, law enforcement is permitted to (1) depress ALBERTO's and MOLINA's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of ALBERTO's and MOLINA's face with their eyes open to activate the facial-, iris-, or retina-

recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

5.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.